# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### September 24, 2013 Session

## STATE OF TENNESSEE v. TRAVEI PRYOR

**Direct Appeal from the Criminal Court for Knox County**
**No. 96358    Jon Kerry Blackwood, Judge**

---

**No. E2012-02638-CCA-R3-CD - Filed December 18, 2015**

---

A Knox County Criminal Court Jury convicted the appellant, Travei Pryor, of eleven counts of aggravated kidnapping, a Class B felony; four counts of aggravated robbery, a Class B felony; four counts of aggravated burglary, a Class C felony; one count of employing a firearm during the commission of a dangerous felony, a Class C felony; one count of possessing a firearm during the commission of a dangerous felony, a Class C felony; and one count of criminal impersonation, a Class B misdemeanor.  After a sentencing hearing, he received an effective twelve-year sentence.  On appeal, the appellant claimed that the evidence was insufficient to support his convictions of employing and possessing a firearm during the commission of a dangerous felony and that the trial court committed reversible error by failing to instruct the jury as provided by State v. White, 362 S.W.3d 559 (Tenn. 2012).  This court concluded that the trial court's failure to instruct the jury pursuant to White constituted reversible error, reversed his eleven convictions of aggravated kidnapping, remanded the case to the trial court for a new trial as to those offenses, and affirmed the appellant's remaining convictions.  The Tennessee Supreme Court granted the State's application for permission to appeal and remanded the case to this court for reconsideration in light of the supreme court's recent opinions in State v. Teats, 468 S.W.3d 495 (Tenn. 2015), and State v. Williams, 468 S.W.3d 510 (Tenn. 2015).  After revisiting the issue pertaining to the White instruction, we conclude that the appellant's convictions of aggravated kidnapping in counts 13 and 14 and counts 20 and 21 must be reversed and the case remanded to the trial court for a new trial as to those offenses.  The appellant's remaining convictions are affirmed.  However, upon remand, the trial court is to merge the appellant's convictions in counts 7 and 8, counts 9 and 10, counts 11 and 12, counts 15 and 16, and counts 17 and 18.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in Part and Reversed in Part, and the Case is Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which ROBERT W.

WEDEMEYER, J., joined. JOHN EVERETT WILLIAMS, J., concurred in part and dissented in part.

Joseph A. Fanduzz, Knoxville, Tennessee, for the appellant, Travei Pryor.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

In January 2011, the appellant and his two codefendants, Walter Patrick and Paul Gillespie, were charged in a multi-count indictment with eleven counts of especially aggravated kidnapping, four counts of aggravated robbery; four counts of aggravated burglary; one count of employing a firearm during the commission of a dangerous felony; and one count of possessing a firearm during the commission of a dangerous felony. In addition, the appellant and Patrick were charged with criminal impersonation. The appellant's case was severed from that of his codefendants.

At trial, twenty-year-old Landry Stanton testified that he used to attend Carter High School in Knox County and played football and basketball for Carter High for three years. During that time, he played against the appellant, who attended Austin East High School. Landry[1] said that he was not around the appellant very often and "didn't really know him" but that he knew the appellant's face and had heard the appellant's voice. On the morning of September 17, 2010, Landry was in his home on Asheville Highway. He shared the home with his brother, Brett Stanton, and Robert Gorman, both of whom were in their bedrooms. Three additional people were in the house: Vanessa Griph, Brett's girlfriend, was in Brett's bedroom with him, and Josh Cox and Paul St. Aubin were sleeping on couches in the living room.

Landry testified that about 9:00 a.m., he awoke and started getting ready for work. He said that while he was in the bathroom, he heard a "big bang" in the living room and heard someone say, "'Get the f*** on the ground.'" Landry said that he panicked, that he walked out of the bathroom, and that a male pointed a gun at him. Landry immediately recognized the male's face and voice as that of the appellant. The appellant told him to go into the living

---

[1]Because two of the witnesses share a surname, we will refer to them by their first names for clarity.

room and get on the floor, and Landry did as he was told. He said that Brett "peek[ed]" out of Brett's bedroom to see what was going on and that the appellant told Brett to come into the living room and get on the floor. Brett did as the appellant instructed, and the appellant asked him if anyone else was in the house. Brett told the appellant that his girlfriend was in his bedroom. The appellant told Brett to get her and bring her into the living room, which Brett did. Landry said that when Robert Gorman "poke[d]" his head out of his bedroom, the appellant told Gorman to get on the ground. The appellant wanted to know where the "weed" and money were and took Brett back to Brett's bedroom. The appellant took eighty dollars and two Mason jars containing marijuana from Brett's room. Then the appellant brought Brett out of the bedroom and left with a second male, who also had a gun and had been standing by the front door during the robbery. Landry did not recognize the second male but had seen him previously.

Landry testified that during the robbery, Josh Cox was lying on the living room floor and Paul St. Aubin was lying on one of the living room couches with "his face in the couch." As the robbers were leaving the home, they grabbed Cox's wallet off a table. Landry described the appellant's gun as "all black." He said that it was not a revolver and that the appellant's pointing the gun at him was "[o]ne of the scariest things that ever happened in [his] life." The robbers fled in an older-model Ford truck, and Brett telephoned 911. At first, the victims did not reveal to the police that the robbers had taken marijuana. However, they later told Detective Colin McLeod about the stolen drugs.

On cross-examination, Landry testified that one of the Mason jars was one-half full of marijuana but that the second jar was only one-quarter full. When Brett telephoned 911 after the robbery, he did not report that the robbers had taken marijuana. A police officer arrived at the scene, and the victims also did not tell him that the robbers had taken marijuana. Hours later, Detective McLeod arrived and confronted the victims about the marijuana. At that point, they admitted marijuana was involved. Landry said that the appellant was wearing a black hoodie over the appellant's face during the robbery but that he was still able to recognize the appellant. He acknowledged that the robbery lasted no more than five minutes.

Twenty-three-year-old Josh Cox testified that on the morning of September 17, 2010, he was lying on a living room couch by the front door. Paul St. Aubin was asleep on a couch across from Cox. Cox said he was sleeping when two males kicked in the front door. At first, Cox did not realize what was happening. He said that by the time he realized what was going on, one of the males was "already through the house." The other male was standing by the front door. Cox got onto the floor. He said that Landry Stanton appeared and that the appellant told Landry to get on the floor. Brett and Robert Gorman came out of their bedrooms, and Landry told Gorman what was going on. Gorman also got on the floor. The

-3-

appellant moved Brett and Vanessa Griph out of Brett's bedroom, escorted Brett back into the bedroom, and told him to get the "weed" and money. The appellant was holding a gun and told the victims that he was going to start shooting if they moved. Cox was terrified. He said that he heard the Mason jars containing marijuana "clink" together and that the two robbers left the house. In addition to marijuana, Cox thought the appellant took money out of Brett's bedroom. The second robber took Cox's wallet, which had been on a stand in front of the couch. Sometime after the robbery, Cox received a telephone call from the Knoxville TVA Employees Credit Union in downtown Knoxville and was told that his wallet had been found outside. Detective McLeod later returned Cox's wallet to him.

On cross-examination, Cox testified that when police officers arrived, he spoke with them but did not tell them that marijuana was involved. He said he had "grown up with guns" and was certain that the appellant used a real gun during the robbery. However, he did not know if the gun was cocked. He acknowledged that his wallet contained credit cards and that no one used the cards.

Jessica Hurd testified that she was a former service member representative for the Knoxville TVA Employee's Credit Union located at Wall Avenue and Gay Street in Knoxville. Sometime in the summer of 2010, a person gave Jason Cox's wallet to Hurd. Hurd said she telephoned Cox and spoke with his mother, who informed Hurd that the wallet had been "taken." While Hurd was at lunch, Detective McLeod came to the credit union and picked up the wallet.

Twenty-four-year-old Brett Stanton testified that he graduated from Carter High School in 2006. In September 2010, Brett was living in a house on Asheville Highway with his brother, Landry, and Robert Gorman. Brett said he knew the appellant "through sports where [Landry] played against him." Landry also had played basketball with Carjuan Hayes for four or five years, and Hayes had been to their home three or four times to play video games. Brett did not know Walter Patrick.

Brett testified that on September 17, 2010, he was lying in bed and heard a "big bang." He left his bedroom and saw the appellant and Patrick holding guns. The appellant pointed a gun at Brett and told him to get on the floor. Brett was terrified and did what he was told. The appellant started screaming, wanting to know if anyone else was in the house. Brett told the appellant that his girlfriend was in the back room, and the appellant made Brett bring Vanessa Griph out of the bedroom. The appellant told Griph to get on the floor and told Brett to go back into the bedroom. Brett said the appellant asked him "where the weed was" and that he pointed to two Mason jars on the floor. One jar contained about one ounce of marijuana, and the other contained a couple of grams of marijuana. The appellant took the jars and grabbed seventy to ninety dollars that was on a futon in the bedroom. Brett said that

-4-

the appellant was covering the appellant's mouth with a shirt during the robbery but that the appellant dropped the shirt a couple of times. The appellant and Patrick left in an older-model white truck.

On cross-examination, defense counsel played Brett's 911 call for the jury. Brett acknowledged that he lied to the 911 operator by not revealing that the robbers had taken marijuana. He also acknowledged that he did not mention the marijuana until Detective McLeod confronted him a couple of hours after the robbery. The appellant was holding a black handgun during the robbery. Brett said that he did not know much about guns but that the appellant's gun "looked pretty real to me." Defense counsel asked him, "But no way of telling me for certain it was a real gun?" Brett answered, "Under the circumstances, I would believe that it's a real gun, hundred percent." He said that the robbery "seemed like it [lasted] forever" but acknowledged that it probably lasted five minutes or less.

Twenty-four-year-old Robert Gorman testified that he used to attend Carter High School and did not know the appellant. On September 17, 2010, Gorman was living in a house on Asheville Highway with Landry and Brett Stanton. That morning, Gorman was asleep in his bedroom when he heard a "big loud bang." He got up to see what was going on and saw two males with black guns. He said that one of the males told him to get on the floor and that he did as he was told. The male asked, "'Is there anybody else in the house?'" Brett answered that his girlfriend was in his bedroom. After Vanessa Griph came out of Brett's room, Gorman heard the male say, "'Where's the weed? Where's the money?" Gorman was scared, stayed on the floor, and did not see what was happening. However, he said, "I'm guessing he's--he's got the weed, and he's got the money, and he's leaving."

On cross-examination, Gorman testified that he did not talk with the police when they first arrived at the scene. However, Gorman later spoke with an investigator and told him about the marijuana.

Twenty-four-year-old Paul St. Aubin testified that he used to attend Carter High School and did not know the appellant. On September 17, 2010, St. Aubin was at the home of Brett and Landry Stanton and was sleeping on a couch. A male kicked in the front door of the home, and he and another male came inside. St. Aubin said that each male was holding a gun and that he "immediately knew what was happening." The males told him, "'Lay down. Don't move." St. Aubin was scared, remained lying on the couch, and "put [his] hands out." He said that one of the males was walking through the house and "clearing everybody out." The second male was standing at the front door. St. Aubin said that he never saw their faces and that they asked, "'Where's the money? Where's the weed at?'"

On cross-examination, St. Aubin testified that he did not give a statement when the

police arrived and did not tell them about the marijuana. He acknowledged that he did not know whether the robbers' guns were real and that they left the home as soon as they got the marijuana and money. St. Aubin could not identify the appellant as one of the robbers.

Twenty-three-year-old Vanessa Griph testified that she used to attend Carter High School and did not know the appellant. On the morning of September 17, 2010, Griph was at the home of her boyfriend, Brett Stanton. Griph said she was lying in bed and heard a "big bang." Brett opened the door, turned around, and told Griph to call 911. Griph looked out the bedroom window and saw a white truck that she had not seen previously. She said that she dialed 911 and started to put her clothes on but that by that time, the appellant had arrived at the bedroom door and "was waiving a gun in [her] face." She said that the gun was black and that she was trying to pay attention to the appellant's face but that he "had his shirt up." The appellant told Griph to go into the living room and get on the floor, and she did as she was told. Griph identified the appellant in court as the male who pointed the gun at her and made her get on the floor.

On cross-examination, Griph acknowledged that after the appellant moved everyone into the living room, he took Brett back into the bedroom. The appellant got the marijuana from the bedroom and left the house. Griph said that she had never seen a gun prior to that day and did not know if the appellant's gun was real but that it "didn't look fake to me." She acknowledged that no one told the first officers on the scene about the marijuana.

Officer Terry Pate of the Knoxville Police Department (KPD) testified that on September 17, 2010, he was patrolling the area of Dandridge Avenue and was two miles or less from the Green Hills Apartments. Officer Pate began looking for a white pickup truck related to the robbery, learned other officers had stopped the truck, and went to the truck's location. The people in the truck told the officers that they had come from an apartment in the Green Hills Apartments, so Officer Pate and other officers went to the apartment to conduct a "knock and talk." Officer Pate said that when they arrived, he remained "one floor down" and that a window to the apartment was above him. Officer Pate heard a commotion and "some shuffling going on." When the apartment door opened, he heard officers order the people in the apartment to come outside. Officer Pate went to the apartment to assist and smelled marijuana. He said that three or four people, including Walter Patrick and Carjuan Hayes, came out of the apartment and that the officers conducted a protective sweep of the apartment to make sure no one else was inside.

Officer Pate testified that the officers received permission to search the apartment. During the search, they found a glass Mason jar in the back bedroom where Officer Pate had heard shuffling. Officer Pate said the type of marijuana in the jar was commonly referred to as "buds" and was "high-end marijuana." He said it weighed twenty-seven grams, which was

considered one ounce "in the street," and was worth $350 to $700. The officers also found a Glock gun case. Two gun magazines and a plastic bag were in the case, and the plastic bag contained about thirty rounds of .40-caliber ammunition. On cross-examination, Officer Pate acknowledged that the appellant was not in the apartment and did not live there.

Officer Nathaniel Skellenger of the KPD testified that on November 3, 2010, he received a report of shots fired in the Mechanicsville area. He went to the area and saw a white Ford Crown Victoria with two males standing beside it. Officer Skellenger approached them and asked if they had heard gunshots. One of the males, who turned out to be the appellant, told Officer Skellenger that his name was Wilmarcus Glasper. The other male, who was Dominic Lane, told Officer Skellenger that the car was his and gave Officer Skellenger permission to search it. In the glove compartment, Officer Skellenger found a bottle of hydrocodone and a loaded Glock Model 22 .40-caliber pistol. The pistol contained twelve rounds of ammunition, and one round was in the chamber. On cross-examination, Officer Skellenger acknowledged that he arrested the appellant for criminal impersonation.

At the conclusion of Officer Skellenger's testimony, the State rested its case. The appellant did not present any witnesses, and the jury convicted him as follows: Counts 1 through 4, alternative theories of aggravated burglary of Landry Stanton's habitation; counts 5 and 6, employing a firearm during the commission of a dangerous felony and possessing a firearm during the commission of a dangerous felony, respectively; counts 7 and 8, alternative theories of aggravated robbery against Brett Stanton; counts 9 and 10, alternative theories of aggravated robbery against Josh Cox; counts 11 and 12, aggravated kidnapping as a lesser-included offense of alternative theories of especially aggravated kidnapping against Vanessa Griph; counts 13 and 14, aggravated kidnapping as a lesser-included offense of alternative theories of especially aggravated kidnapping against Josh Cox; counts 15 and 16, aggravated kidnapping as a lesser-included offense of alternative theories of especially aggravated kidnapping against Paul St. Aubin; count 17, aggravated kidnapping as a lesser-included offense of especially aggravated kidnapping against Robert Gorman; counts 18 and 19, aggravated kidnapping as a lesser-included offense of alternative theories of especially aggravated kidnapping against Landry Stanton; counts 20 and 21, aggravated kidnapping as a lesser-included offense of alternative theories of especially aggravated kidnapping against Brett Stanton; and count 22, criminal impersonation.

After a sentencing hearing, the trial court merged the appellant's aggravated burglary convictions in counts 1 through 4 and his employing/possessing a firearm during the commission of a dangerous felony convictions in counts 5 and 6. The trial court sentenced the appellant to consecutive sentences of six years for aggravated burglary, a Class C felony, and six years for employing a firearm during the commission of a dangerous felony, a Class C felony. The trial court sentenced the appellant to eight years for each of his aggravated

kidnapping convictions, a Class B felony, and six months for his criminal impersonation conviction, a Class B misdemeanor, and ordered that those convictions be served concurrently with the six-year sentence in count 1 for a total effective sentence of twelve years.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant claims that the evidence is insufficient to support his convictions for employing and possessing a firearm during the commission of a dangerous felony because the evidence fails to show that he used an authentic firearm during the robbery; because the victims' lying to the police about the stolen marijuana demonstrates that they were not credible; and because the Glock gun box, ammunition, and pistol found after the robbery were never connected to him. The State argues that the evidence is sufficient. We agree with the State.

"When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction." State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012); see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. See Wagner, 382 S.W.3d at 297; State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The jury, as the finder of fact, is responsible for assessing the credibility of the witnesses, deciding the weight to accord their testimony, and reconciling any conflicts in the proof. See Wagner, 382 S.W.3d at 297; State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). On appeal, this court cannot re-weigh the evidence or draw any inferences from it other than those drawn by the jury. See Wagner, 382 S.W.3d at 297; Cabbage, 571 S.W.2d at 835. A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of both. "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" Dorantes, 331 S.W.3d at 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As charged in the indictment, it is an offense to possess a firearm with the intent to go armed during the commission of a dangerous felony or employ a firearm during the commission of a dangerous felony. Tenn. Code Ann. § 39-17-1324(a), (b)(1). The trial court

instructed the jury that the "dangerous felony" in this case was aggravated burglary. See Tenn. Code Ann. § 39-17-1324(i)(1)(H).

Taken in the light most favorable to the State, the evidence shows that on the morning of September 17, 2010, the appellant and Walter Patrick kicked open the door to the home of Landry Stanton, Brett Stanton, and Robert Gorman. The appellant had a handgun, pointed it at the three residents and their three guests, and forced all but one of them onto the living room floor. He also threatened to "start shooting" if anyone moved. Josh Cox testified that he had "grown up with guns" and was certain the appellant's gun was real. Brett Stanton testified that the appellant's gun looked authentic and that he thought it was real "[one] hundred percent." In fact, nothing indicates that the weapon used by the appellant was anything but a real firearm. See State v. Billy J. Blankenship, No. E2011-01550-CCA-R3-CD, 2012 WL 5356288, at*8 (Tenn. Crim. App. at Knoxville, Oct. 31, 2012) (concluding in defendant's appeal of his robbery and theft convictions that testimony by bank employees and still photographs taken during bank robbery "revealed nothing to indicate that the gun in Blankenship's hand was anything other than an actual firearm capable of shooting bullets"). As for the appellant's claim that the victims' testimony about the gun was not credible, the credibility of the witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnessess' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). The jury obviously accredited the victims' testimony. Therefore, we conclude that the evidence, regardless of whether the pistol found after the robbery was linked to the appellant, is sufficient to support the convictions.

## B. White Instruction

The appellant contends that the trial court committed reversible error by failing to instruct the jury properly on the especially aggravated kidnapping charges in light of State v. White, 362 S.W.3d 559 (Tenn. 2012).[2] The State concedes that the trial court erred as to the appellant's aggravated kidnapping convictions in counts 13 and 14 involving Josh Cox and his aggravated kidnapping convictions in counts 20 and 21 involving Brett Stanton but argues that the trial court's error was harmless. We agree with the State that the trial court should have given a White instruction with regards to the appellant's especially aggravated

---

[2]We note that White was decided after the appellant's trial and after the appellant filed his motion for new trial. However, the appellant raised White in his amended motion for new trial, and his case was in the "'appellate pipeline'" when the supreme court issued its opinion. State v. Robert Jason Burdick, No. M2012-01071-CCA-R3-CD, 2013 WL 2642313, at *12 (Tenn. Crim. App. at Nashville, June 11, 2013) (quoting State v. Bennie Osby, No. W2012-00408-CCA-R3-CD, 2012 WL 5381371, at *7 (Tenn. Crim. App. at Jackson, Nov. 2, 2012), perm. to appeal denied, (Tenn. 2013)).

kidnapping charges in counts 13, 14, 20, and 21. However, under the facts of this case, we cannot say that the trial court's error was harmless beyond a reasonable doubt. Therefore, the appellant's aggravated kidnapping convictions in those four counts must be reversed and the case remanded to the trial court for a new trial on those offenses.

Relevant to this case, Tennessee Code Annotated section 39-13-305(a)(1) defines especially aggravated kidnapping as "false imprisonment, as defined in § 39-13-302 . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." False imprisonment is defined as the knowing removal or confinement of another unlawfully so as to interfere substantially with the other's liberty.[3] Tenn. Code Ann. § 39-13-302(a). The jury ultimately convicted the appellant of aggravated kidnapping, which, as defined in this case, is false imprisonment "[c]ommitted . . . [w]hile the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon." Tenn. Code Ann. § 39-13-304(a)(5). Our case law reveals a long-standing issue regarding the legitimacy of a kidnapping conviction when the act(s) establishing the offense occurred during an accompanying felony.

In State v. Anthony, 817 S.W.2d 299, 301 (Tenn. 1991), a jury convicted the defendant of the armed burglary of a Shoney's restaurant, the armed robbery of the restaurant's manager, and the aggravated kidnappings of the manager and five other employees. In a split decision, this court reversed all of the aggravated kidnapping convictions, holding that "[u]nless independent and separate fact patterns for both the armed robbery and the aggravated kidnapping can be proven, appellant can be convicted of only the armed robbery." Anthony, 817 S.W.2d at 30. Our supreme court, citing due process concerns, held that before a separate kidnapping conviction may be sustained, there must be a determination of

> whether the confinement, movement, or detention [was] essentially incidental to the accompanying felony and [was] not, therefore, sufficient to support a separate conviction for kidnapping, or whether it [was] significant enough, in and of itself, to warrant independent prosecution and [was], therefore, sufficient to support such conviction.

Id. at 306. After its own analysis, our supreme court affirmed this court. Id. at 307-08.

Later, in State v. Dixon, 957 S.W.2d 532, 535 (Tenn. 1997), our supreme court

---

[3]Counts 11, 13, 15, 18, and 20 alleged that the defendants removed the named victims, and counts 12, 14, 16, 17, 19, and 21 alleged that the defendants confined the named victims.

modified the <u>Anthony</u> court's "essentially incidental" analysis and established a two-prong test for determining whether a separate conviction for kidnapping violates due process. The first step concerned a determination of whether the movement or confinement was beyond that necessary to commit the accompanying felony. <u>Id.</u> If so, the second step concerned ascertaining whether the additional movement or confinement (1) prevented the victim from summoning help; (2) lessened the appellant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm. <u>Id.</u>

In <u>White</u>, our supreme court expressly overruled <u>Anthony</u> and its progeny, holding that "[t]he separate due process test articulated first in <u>Anthony</u>, and subsequently refined in <u>Dixon</u> . . . , is . . . no longer necessary to the appellate review of a kidnapping conviction accompanied by a separate felony." 362 S.W.3d at 578. Instead, the court held that "whether the evidence, beyond a reasonable doubt, establishes each and every element of kidnapping, as defined by statute, is a question for the jury properly instructed under the law," thereby concluding that a defendant's constitutional concerns are protected by appellate review of the sufficiency of the convicting evidence. <u>Id.</u> at 577-78. Therefore, our supreme court cautioned that "trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." <u>Id.</u> To effectuate this end, our supreme court devised the following instruction to be given by trial courts:

> To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:
>
> • the nature and duration of the victim's removal or confinement by the defendant;
>
> • whether the removal or confinement occurred during the commission of the separate offense;
>
> • whether the interference with the victim's liberty was inherent in the nature of the separate offense;
>
> • whether the removal or confinement prevented

-11-

the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;

• whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

• whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

Id. at 580-81 (footnote omitted).

The State argues that White is inapplicable to the aggravated kidnappings of Vanessa Griph in counts 11 and 12; Paul St. Aubin in counts 15 and 16; Robert Gorman in count 17; and Landry Stanton in counts 18 and 19 because the victims of the aggravated robberies were Brett Stanton in counts 7 and 8 and Josh Cox in counts 9 and 10. The State contends that "[s]ince the other aggravated kidnapping victims were not victims of aggravated robbery, those kidnapping offenses did not 'accompany' the robbery offenses as contemplated in White." Using that same rationale, the State concedes that the trial court erred by failing to instruct the jury on the "substantial interference" element outlined in White for the kidnappings of Cox in counts 13 and 14 and Brett Stanton in counts 20 and 21. However, the State argues that the trial court's error was harmless.

Until recently, this court was in disagreement as to whether a White jury instruction was required when the charges of kidnapping and the accompanying offense did not involve the same victim. However, in State v. Teats, 468 S.W.3d 495, 503 (Tenn. 2015), and State v. Williams, 468 S.W.3d 510, 516 (Tenn. 2015), our supreme court expressly held that a White instruction is not required when the kidnapping and the accompaning offense involve different victims. As the court explained in Teats,

Where a defendant is charged with kidnapping and an accompanying offense involving some confinement of the same victim, there are appropriate due process concerns that the defendant could be convicted of two crimes—e.g. robbery and kidnapping—when he has only committed one crime—robbery. But where, as in this case, the State charged the Defendant with

robbing the restaurant manager and kidnapping the four other employees, the Defendant does not stand the risk of being convicted of kidnapping a victim he confined only long enough to rob. Simply put, the due process concerns articulated in White are not present, as the kidnapping of one or more victims can never be "essentially incidental" to an offense perpetrated against a different victim or victims. See White, 362 S.W.3d at 580.

Teats, 468 S.W.3d at 503.

In this case, the trial court instructed the jury on especially aggravated kidnapping as follows:

Any person who commits the offense of especially aggravated kidnapping is guilty of a crime.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant knowingly removed or confined another unlawfully so as to interfere substantially with the other's liberty; and

(2) that the confinement or removal was accomplished with a deadly weapon or by display of any article used or fashioned to lead the alleged victim to reasonably believe it was a deadly weapon.

Pursuant to Teats and Williams, the trial court did not err by failing to give a White instruction as to the appellant's especially aggravated kidnapping charges in counts 11 and 12, involving Vanessa Griph; 15 and 16, involving Paul St. Aubin; count 17, involving Robert Gorman; and counts 18 and 19, involving Landry Stanton. The court should have given a White instruction, though, with regard to the appellant's especially aggravated kidnapping charges in counts 13 and 14, involving Josh Cox, and counts 20 and 21, involving Brett Stanton, because Cox and Brett Stanton were also the named victims of the aggravated robberies in counts 9 and 10 and counts 7 and 8, respectively. Although the trial court instructed the jury in accordance with the pattern jury instruction in effect at that time, it "did

-13-

not define the key element—the substantial interference with the victim's liberty—as requiring a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." White, 362 S.W.3d at 580. Given the facts of this case, we conclude that the issue of whether the appellant substantially interfered with the liberty of Cox and Brett Stanton in the accompaniment of aggravated robbery was fairly raised by the evidence, and, therefore, that the trial court failed to instruct the jury properly on the especially aggravated kidnappings of those two individuals.

We must now determine the effect of the error. The error at issue is a non-structural constitutional error; accordingly, the test to determine whether the error is harmless is "'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" State v. Climer, 400 S.W.3d 537, 556 (Tenn. 2013) (quoting State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008)).

The evidence at trial shows that on the morning of September 17, 2010, the appellant and Patrick were armed with handguns and burst into the home of Landry Stanton, Brett Stanton, and Robert Gorman. The appellant ordered everyone into the living room and threatened to shoot them if they moved. After everyone was secured in the living room, the appellant took Brett to Brett's bedroom to get the money and two Mason jars containing marijuana. Meanwhile, Patrick continued to hold the victims in the living room. When the appellant came out of the bedroom, Patrick grabbed Cox's wallet off a table, and the two of them left the residence immediately. Given that the defendants' confinement of Cox and Brett Stanton occurred during the accompanying robbery, that the confinement was limited primarily to the living room, and that the confinement ended as soon as the defendants exercised control of the marijuana and money, we conclude that whether the appellant's confinement of the two individuals was essentially incidental to the accompanying aggravated robbery was subject to different interpretations by the jury and was not harmless beyond a reasonable doubt. Therefore, the appellant's aggravated kidnapping convictions in counts 13, 14, 20, and 21 must be reversed and the case remanded for a new trial on those offenses.

We note that during the appellant's sentencing hearing, the trial court merged his conviction of possessing a firearm during the commission of a dangerous felony in count 6 into his conviction of employing a firearm during the commission of a dangerous felony in count 5. According to the judgments of conviction for the aggravated burglary convictions in counts 1 through 4, the trial court also merged counts 2, 3, and 4 into count 1. However, the trial court failed to merge the appellant's convictions for the aggravated robbery of Brett Stanton in counts 7 and 8, his convictions for the aggravated robbery of Josh Cox in counts 9 and 10, his convictions for the aggravated kidnapping of Vanessa Griph in counts 11 and 12, his convictions for the aggravated kidnapping of Paul St. Aubin in counts 15 and 16, and

his convictions for the aggravated kidnapping of Landry Stanton in counts 18 and 19. The dual aggravated robbery convictions were based upon alternative theories of committing robbery by violence or putting the victim in fear, and the dual aggravated kidnapping convictions were based upon alternative theories of false imprisonment by removal or confinement. See Tenn Code Ann. §§ 39-13-402(a)(1), -401(a), -304(a)(5), -302(a). When a jury convicts under alternative theories, the trial court must merge the convictions. See, e.g., State v. Cribbs, 967 S.W.2d 773, 778 (Tenn. 1998) (discussing merger of convictions for first degree premeditated and felony murder).[4] We note that the trial court also should have merged the appellant's dual convictions in counts 13 and 14 and counts 20 and 21, which were based upon alternative theories of aggravated kidnapping. However, given our conclusion that those convictions must be reversed, the trial court's failure to merge the counts is a non-issue.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court's failure to instruct the jury pursuant to White in counts 13 and 14 and counts 20 and 21 constitutes reversible error. Therefore, those four convictions of aggravated kidnapping must be reversed and the case remanded to the trial court for a new trial as to those offenses. The appellant's remaining convictions affirmed. However, upon remand, the trial court is to merge the appellant's convictions in counts 7 and 8, 9 and 10, 11 and 12, 15 and 16, and 18 and 19.

_____
NORMA McGEE OGLE, JUDGE

---

[4]Our supreme court recently debunked this court's repeated holdings that a trial court must impose a single judgment of conviction for merged counts. State v. Marquize Berry, No. W2014-00785-SC-R11-CD, slip op. at 5 (Tenn. Nov. 16, 2015) (order).